**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**SHIRLEY JENKINS, as Personal**
**Representative for the Estate of Jovon**
**Frazier, deceased,**

    **Plaintiff,**

v.     Case No. 8:13-cv-2796-T-30TGW

**CORIZON HEALTH, INC.,**

    **Defendant.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Corizon Health, Inc.'s Motion for Summary Judgment (Dkt. 86), Plaintiff's Response in Opposition (Dkt. 99), and the parties' Replies thereto (Dkts. 101, 106). The Court, having reviewed the motion, response, replies, record evidence, and being otherwise advised in the premises, concludes that Defendant Corizon's motion should be granted and final judgment entered in its favor because Plaintiff has not provided any evidence that Corizon had a custom or policy that was the moving force behind a constitutional violation.

## BACKGROUND

This section 1983 case arises from the death of Jovon Frazier. Plaintiff Shirley Jenkins is the personal representative of Frazier's estate. The amended complaint alleges that, while confined in the Manatee County Jail, Frazier received deliberately indifferent

medical care that resulted in the amputation of his left arm on February 2, 2010, and Frazier's death on September 18, 2011. During the relevant time that Frazier was an inmate, Manatee County contracted with Defendant Corizon Health, Inc., to provide medical care within the Manatee County jail system.

On February 18, 2009, Frazier became an inmate at the Manatee County jail. That same day, an Intake Screening was performed revealing no medical issues. On February 26, 2009, a history and physical examination was performed; this examination also proved unremarkable.

On July 22, 2009, Frazier completed an Inmate Medical Request Form, stating that he had "sharp pains" in his "left shoulder and down to [his] elbow." The form was triaged by a nurse and forwarded to the sick call nurse, Karen Worthington, who examined Frazier on July 24, 2009. Worthington observed that Frazier could move the arm without difficulty. Frazier told Worthington that the pain was the result of falling on his arm several months earlier. Consulting a Nursing Evaluation Tool, Worthington treated Frazier with Tylenol, twice a day for three days.

On August 3, 2009, Frazier completed another Inmate Medical Request Form that complained of left shoulder pain. He complained of a "very sharp pain in [his] left shoulder," and noted that he thought it was "fractured." The form was triaged by a nurse and sent to Worthington, who examined Frazier on August 4, 2009. Frazier told Worthington that the pain was only present when doing push-ups; he could still move his arm and there was no indication of bruising or swelling. After consulting the Nursing Evaluation Tool,

Worthington concluded that no additional care was necessary. However, a physician assistant ordered Salsalate, 1500 mg., twice a day for ten days. This order was entered on the same day as Worthington's examination.

On August 10, 2009, physician assistant Aaron Scoggins examined Frazier. Frazier informed him that he had injured his left arm jumping from one bunk to another. On examination, Frazier had a full range of motion in his shoulder and full strength. The assessment was "left shoulder pain." Scoggins ordered Flexeril, a muscle relaxant, for seven days.

Over the next few weeks, Frazier complained of a rash under his other arm and Scoggins ordered pain medication and two antibiotics. On September 4, 2009, Frazier completed an Inmate Medical Request Form complaining of pain in his left shoulder. Scoggins examined Frazier, ordered Salsalate, an anti-inflammatory, and an x-ray. The x-ray was performed one week later and was negative.

Scoggins saw Frazier again on September 21, 2009, to follow-up on the condition and ordered a complete blood count. The blood count results were normal.

On September 23, 2009, Frazier completed another Inmate Medical Request Form. He stated: "Something been wrong with my arm for month and I want to know what's wrong with it nothing has been done to fix the problem and now its effecting my whole left arm and other place and it really hard for me to go to sleep. I would really like if someone fix my problem and get my arm back together."

Frazier again complained of shoulder pain on September 28 and October 2, 2009. The September 28, 2009 Inmate Medical Request Form stated, in relevant part: "I need to see a doctor! I been having sharp pain in my left shoulder and I don't need pills. It's stopping me from sleeping . . . I done put a lot of sick calls in [illegible] ya'll keep sending me back and ain't tell me nothing. I need to [illegible] a doctor!"

The October 2, 2009 Inmate Medical Request Form stated: "My arm been bother me for months. Nothing nobody seems to help. I really need someone to see about my arm no medicine is given to me now. My arm tighten up on me [illegible] pain run to my shoulder to my hand pain that'll make a grow man cry."

On October 8, 2009, Scoggins examined Frazier. Scoggins noted the x-ray results and observed that Frazier had complete range of motion. Scoggins concluded that Frazier should continue the current medications.

On October 10, 13, and 18, 2009, Frazier completed additional Inmate Medical Request Forms. Like the previous forms, he complained of serious pain in his left shoulder that was getting "worser and worser." The jail physician, Dr. Rubio, examined him and entered orders for pain medication. Dr. Rubio also examined Frazier on October 21, 2009.

On October 23, 2009, Frazier completed another Inmate Medical Request Form. He stated that his shoulder "would not stop hurting day and night. The doctor informed me that I need surgery but would not call no one to get me help."

On October 27, 2009, Scoggins examined Frazier. The examination revealed a "large firm area, left shoulder, positive tenderness to palpation." Scoggins, concerned that there

might be an abscess, ordered a complete blood count and another x-ray. The x-ray was performed two days later and showed an "inferior subluxation of humeral head usually secondary to fluid and tendon injury." An MRI was recommended.

On October 29, 2009, under Dr. Rubio's order, Frazier was sent to Manatee Memorial Hospital. Orthopedist Steven Shafer, M.D. examined Frazier; that examination revealed that "simple rotation was mildly painful. However, any elevation above 30 or 40 degrees causes him discomfort." The MRI resulted in an impression of "large mass involving the proximal left arm, most likely osteosarcoma." Osteosarcoma is a very rare bone cancer, affecting approximately 400 people in the United States per year. Frazier's cancer was an unusual presentation because this type of cancer usually appears in leg bones. A CT scan of the chest performed the same day did not show metastasis to the lungs. Frazier returned to the jail on October 31, 2009.

A Consultation Request was completed for Frazier to be seen at Florida Cancer Specialists, and an appointment was made for November 4, 2009. Frazier was seen by Dr. Telekuntla at Florida Cancer Specialists on November 4, 2009, due to the suspected osteosarcoma, and he suggested that Frazier be seen at Moffitt Cancer Center in Tampa.

Moffitt is one of the leading centers for the treatment of osteosarcoma. However, neither Manatee County nor Corizon had a contract with Moffitt and one needed to be in place before Frazier could be transferred to Moffitt. This process typically takes a month but Janet Giuffrida, Corizon's administrative assistant in the jail, was able to get a contract in place in less than a week.

David Cheong, M.D. treated Frazier at Moffitt. Specifically, Frazier received chemotherapy and related treatment. In late November, a nurse at the jail noticed that Frazier's arm was swollen. Dr. Rubio saw Frazier on November 30, 2009, noting that the "left shoulder increased in size to over three times what it was on intake evaluation." Throughout this time, Frazier was provided Morphine and other pain medications.

On December 3, 2009, Frazier returned to Moffitt and saw Dr. Reed, a medical oncologist. According to Dr. Reed's notes, Frazier informed him that "the nurses and medical facility workers in the jail do a good job with trying to keep his spirits and he feels that they provide great care." Reed's diagnosis was a "high grade osteosarcoma."

Dr. Reed's plan was to provide chemotherapy, using three different drugs: Methotrexate, Cisplatin, and Doxorubicin. These drugs were to be given over six cycles, with two cycles occurring, then amputation of the left arm, then four additional cycles. Subsequently, Frazier received chemotherapy treatment at Moffitt. Any medications that Moffitt prescribed were continued at the jail.

On January 25, 2010, Frazier was released from the jail's custody. However, before he left, Giuffrida arranged for him to continue treatment at Moffitt, including arranging for him to be accepted by Medicaid.

On February 2, 2010, Dr. Cheong performed the amputation of Frazier's left arm. A surgical pathology report issued on February 11, 2010, demonstrated the surgical margins were free of the tumor. According to Dr. Cheong, that meant that the tumor was eliminated, but it could return.

Subsequently, Frazier did not consistently appear at Moffitt for his chemotherapy treatment. Dr. Reed had planned six cycles of chemotherapy. The record reflects that Frazier wanted to stop the treatment because it made him feel miserable and that, at some point, Dr. Reed offered to get down on his knees and beg Frazier to continue with the chemotherapy.

In June 2010, a CT scan of the thorax showed metastatic disease in the right lung. Frazier's health continued to decline; he died on September 18, 2011.

According to Plaintiff's expert, Dr. Howard Abel, who is Board Certified in Internal Medicine and Medical Oncology, Corizon, during the period of July 2009, through late October 2009, "did not follow a proper process to get to an answer regarding what is the cause of [Frazier's] pain and disability." In Abel's opinion, Frazier should have been referred to outside medical care sooner, which may have resulted in an earlier cancer diagnosis.

The record reflects that, during the relevant time, Corizon had a Health Services Agreement with Manatee County to provide "necessary and proper medical, psychiatric, dental and other health care services for persons remanded to their care, custody and control within the county correction system." Notably, under section 3.B.1 of the contract, a portion of Corizon's base price was allocated to the payment for inmate medical services outside the jail. Over the course of a contract year, that allocation was $950,000. In the event that the amount for outside medical services exceeded that amount, the County was responsible for the costs. In the event aggregate outside medical services did not reach the allotted amount

($950,000) in any year, Corizon was required to refund the remainder to the County. Corizon maintained detailed records of the claims according to both the amount billed by outside medical providers and the amount actually paid after contractual discounts. For Frazier's care during his incarceration, the County and Corizon were billed $412,353.00, and paid $161,965.34.

According to the Affidavit of Scott M. Kennedy, MD, Corizon's Regional Medical Director during the relevant time, part of his responsibilities included the approval of outside care to be provided to inmates within the Manatee County Jail, through a process called Utilization Management. The Utilization Records pertaining to Frazier reflect that each time a request for outside medical care was made by a provider in the Manatee County Jail regarding Frazier, Kennedy approved the request. According to Kennedy, Corizon's mission was to provide inmates in the Manatee County Jail with all necessary medical care, and the decision to approve that care was never based on costs.

Plaintiff's section 1983 claim against Corizon focuses entirely on the events that occurred from July 2009, through the end of October 2009. Plaintiff contends that Corizon provided inadequate treatment of Frazier's increasingly painful left shoulder. Plaintiff argues that the medical treatment was deliberately indifferent to a serious medical need because Corizon should have referred Frazier to an outside healthcare provider sooner. Plaintiff states that, by the time Corizon referred Frazier to outside care, it was too late to avoid amputation of his left arm and his subsequent death due to osteosarcoma. And that it was

Corizon's custom, policy, and practice to discourage diagnostic testing and outside care for financial reasons.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## **DISCUSSION**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, which is prohibited by the Eighth Amendment." *Harris v. Leder*, 519 Fed. Appx. 590, 595 (11th Cir. May 24, 2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). Not every claim of inadequate medical attention rises to the level of a constitutional violation. To show that a prison official acted with deliberate indifference to serious medical needs, a prisoner must establish three elements. First, he must satisfy the objective component by showing that he had a serious medical need. Second, he must satisfy the subjective component by showing that a prison official acted with deliberate indifference. Third, as with any tort claim, the prisoner must show that the injury was caused by the defendant's wrongful conduct. *See Goebert v. Lee County,* 510 F.3d 1312, 1326 (11th Cir. 2007).

To establish the subjective component, a prisoner must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence. *See Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005); *Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999). A delay in providing medical treatment can sustain a "deliberate indifference" claim, where the delay has exacerbated the prisoner's injury or unnecessarily prolonged the inmate's pain. *See Harper v Lawrence County, Ala.,* 592 F.3d 1227, 1235 (11th Cir. 2010). In this type of case, the nature of the medical need, the reason for the delay, and the effect of the delay on the prisoner's medical condition are all relevant factors in determining whether the delay has reached constitutionally intolerable proportions. *See Goebert,* 510 F.3d at 1327.

Any plaintiff bringing a section 1983 claim against a municipality based on the acts of one of its employees/agents must prove two things. First, plaintiff must sufficiently allege a constitutional violation. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986). Second, the "plaintiff suing a municipality under § 1983 must show that the municipality itself injured the plaintiff *by having in place a policy or custom which violated the plaintiff's rights.*" *Buckner v. Toro,* 116 F.3d 450, 451 (11th Cir. 1997) (citing *Monell v. Dept. of Social Servs. of New York,* 436 U.S. 658 (1978) (emphasis added)). Under *Monell,* the municipal "policy" or "custom" must be the moving force behind the constitutional violation and "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the

municipality can the failure be properly thought of as an actionable city 'policy.'" *City of Canton, Ohio v. Harris,* 489 U.S. 378, 379 (1989).

Here, although Corizon is a private entity, it is considered a municipality for purposes of section 1983 liability because Manatee County contracted with it to provide medical care within the Manatee County jail system. In other words, Corizon performed traditional public functions. *See Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 181-82 (11th Cir. Sep. 6, 2012) (noting that: "Although Prison Health is not a governmental entity, '[w]here a function which is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity,' that private entity, like a municipality, may be held liable under § 1983") (quoting *Ancata v. Prison Health Servs.,* 769 F.2d 700, 703 (11th Cir. 1985)).

The Court concludes that Corizon is entitled to judgment as a matter of law because there is not even a scintilla of evidence establishing, or even suggesting, that Corizon had a policy or custom in place that was the moving force behind a constitutional violation. There is no evidence that Corizon discouraged its staff from referring inmates with complaints of serious medical conditions to its physicians and outside medical practioners or facilities for examination and/or treatment. There is no evidence that Corizon discouraged its staff from requesting expensive diagnostic tests and procedures. Indeed, there is no evidence that Corizon was concerned about costs at all in this case.

To the contrary, the evidence is undisputed that Corizon's contract with Manatee County provided a fund for outside medical care of $950,000. If less than $950,000 was incurred, the difference had to be refunded to the County. If outside care exceeded that

amount, the County was responsible for the additional costs. Thus, Corizon did not have any financial incentive to avoid outside medical care or bear any risk if the medical costs exceeded the estimate. The evidence is also undisputed that Corizon approved every request for outside care and made great efforts to help Frazier receive treatment at Moffitt, one of the best cancer treatment facilities. The evidence also reflects that Corizon fully cooperated with the doctors at Moffitt to continue any care that was necessary while Frazier was still in Corizon's custody.

Plaintiff argues that Corizon should have referred Frazier to outside care sooner but does not point to any custom or practice, whether written or unwritten, that was the moving force behind any failure to act more quickly. Plaintiff's arguments that financial concerns must have played a role in Corizon's failure to seek outside care prior to October 2009, are premised on pure conjecture and speculation.

In sum, even if the Court were to assume that a constitutional violation occurred in this case, Plaintiff does not point to a genuine issue of fact to establish Corizon's liability. There is simply no evidence of a policy or custom that was the moving force of the constitutional violation.[1]

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant Corizon Health, Inc.'s Motion for Summary Judgment (Dkt. 86) is granted.

---

[1] The record is also bereft of any evidence establishing a failure to train.

2. The Clerk of Court is directed to enter judgment in Defendant Corizon Health, Inc.'s favor and against Plaintiff.

3. The Clerk of Court is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on March 24, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Even\2013\13-cv-2796.msj-86-grant.wpd